FILED IN CHAMBERS
U.S.D.C. Rome

MAR 18 2008

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CELENA JONES,

    Plaintiff,

v.

GEORGIA DEPARTMENT OF
CORRECTIONS,

    Defendant.

CIVIL ACTION

NO. 1:07-CV-1228-RLV

O R D E R

This is a disability discrimination action brought pursuant to the Americans with Disabilities Act of 1990, 42 U.S.C.A. §§ 12101-12213 ("ADA"), and the Rehabilitation Act of 1973, 29 U.S.C.A. §§ 701-796 (amended 1998)("Rehabilitation Act"), alleging that the Georgia Department of Corrections ("GDC") failed to accommodate Celena Jones' disability and constructively discharged her. Pending before the court is a Motion for Summary Judgment [Doc. No. 14] by the GDC. For the following reasons the motion is granted.

**Factual and Procedural Background**

Celena Jones lost both of her legs and several fingers from meningitis as a child, and she currently uses prosthetic legs on a daily basis to assist her in walking. On July 1, 2005, Jones began employment as a counselor at Ware State Prison. At that time, Carl Humphrey was the warden, and he was in charge of prison operations

and personnel management. During the relevant time frame Randall Holden served as deputy warden. Shirlyn Thomas served as the Chief Counselor and the plaintiff's direct supervisor. Ware prison is a "close" security prison--one level below maximum security--and houses approximately 1200 inmates who, because of the length of their sentences, behavioral problems, and prison history, pose an elevated security risk and require supervision at all times.

Ware prison employs approximately six to seven counselors, whose offices are located outside the inmate housing area. Each counselor is assigned to one of ten inmate housing units and must walk various distances across the prison grounds to meet with his or her assigned inmates inside the inmate housing unit. At the beginning of Jones' employment as a counselor, she was required to attend an orientation and training program conducted outside the inmate housing area. On the third day of her training, Jones attended a tour of the prison facility. It was during this prison tour that Jones began experiencing difficulties with her prosthetics.

Jones suffered bruising and bleeding on her legs as a result of the amount of walking during the tour. Although the parties dispute precisely when Jones informed prison staff that she was having difficulty walking and therefore required some form of

2

transportation, the material fact in this regard is that at the conclusion of the orientation tour Jones met with Chief Counselor Thomas and Deputy Warden Holden to discuss an accommodation for her inability to walk long distances within the prison grounds. As part of her upcoming responsibilities Jones would be required to make several trips daily between her office and the various inmate housing units. Following the tour of the facility, the plaintiff became concerned about the distances she would be required to walk to perform her duties. Although she can walk with her prosthetics, the more she walks the less distance she can cover and she felt that she would be unable to walk as much as her prospective duties required. Consequently, Jones requested accommodation for her disability.

During her meeting with Thomas and Holden, Jones asked for an accommodation such as a golf cart or other motorized cart. At that time, Ware prison had a golf cart on the prison grounds for use by the prison medical unit. Although the parties dispute whether Jones would actually have been required to walk such long distances during the course of her workday, Jones alleges that her job required going back and forth between multiple housing units and the counseling staff offices. Jones has acknowledged that her proposal to use the medical golf cart arose from her seeing it on

the prison grounds and thinking that it would be suitable to accommodate her disability in the performance of her new job. Deputy Warden Holden rejected her request to use the medical golf cart.

Subsequently, Jones met with the prison warden and informed him that her prostheses had become painful during the prison tour and that she would be unable to walk the distances required by her new position. At that point, Warden Humphrey and Jones discussed an accommodation. Warden Humphrey rejected Jones' request to use the medical golf cart because it would create a security threat. The golf cart is too large to fit through the doors of the housing units and Jones would be required to leave it unattended while she met with her assigned inmates, which poses a security risk because pieces of the golf cart could be removed and used as weapons or the cart could be used to transport contraband. Moreover, dedicating additional staff to watch the golf cart inside the inmate areas was not a practical option. As an alternative, Warden Humphrey proposed to modify Jones' case load and ensure that she was assigned only to inmates in Building A, the housing unit closest to her office, which should have reduced her walking to a minimum. Jones rejected that proposal, though, due to her concern for the total amount of walking she would still be required to do.

4

However, utilizing the medical golf cart to accommodate Jones was apparently not the only option. According to Jones, she also proposed using a "motorized scooter." In her mind, a motorized scooter was an example of the type of transport customarily used by disabled persons, which is basically a motorized form of a wheelchair. Jones contends that while she even offered to pay for the motorized scooter herself, Warden Humphrey rejected this idea outright as part of his rejection of the golf cart proposal. The GDC disputes this fact and asserts that Warden Humphrey never understood Jones' proposal to include anything other than the prison's golf cart. According to the GDC, if Warden Humphrey had understood that Jones was also proposing to use a motorized scooter, something like a motorized wheelchair and substantially different than a golf cart, he would have approved its use. The parties do not dispute that use of a motorized scooter would have been an acceptable accommodation; they dispute whether using a motorized scooter, as an alternative to using the prison golf cart, was ever a part of the accommodation discussions.

At the conclusion of the meeting between Warden Humphrey and Jones, Warden Humphrey had rejected the idea of using the golf cart but had proposed assigning Jones to the inmate housing area closest to her office. Jones admits that Warden Humphrey encouraged her to

5

stay at Ware prison and that he asked her to think about his proposed accommodation overnight. She also admits that he asked her to contact him personally if his proposal was unacceptable. In response Jones said that she did not think being assigned to the closest inmate housing unit was sufficiently helpful but that she would think about it. Warden Humphrey asked Jones to let him know whether his proposed accommodation would work. Instead of continuing the accommodation discussions with the warden, however, Jones resigned from Ware prison. Jones apparently did not feel that there was anything left to discuss with Warden Humphrey because he had rejected her request to use motorized transportation.

Based on this incident, Jones filed the instant action in Superior Court of Fulton County, Georgia, against the GDC for disability discrimination under the ADA and the Rehabilitation Act. Jones alleges that the GDC failed to accommodate her disability and constructively discharged her. The GDC subsequently removed this action to federal court and eventually filed the pending summary judgment motion.

**MOTION FOR SUMMARY JUDGMENT**

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of his or her claim on which he or she bears the ultimate burden of proof. Id. at 322-23. Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324. Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. at 322.

The GDC's motion first argues that it is immune from Jones' claims under the ADA because it is entitled to sovereign immunity under the Eleventh Amendment to the United States Constitution. The GDC moves for summary judgment on the Rehabilitation Act claim,

7

and on the ADA claim as well if its immunity assertion is rejected, on the grounds that it made a reasonable effort to accommodate Jones' disability and that she caused the breakdown in discussions.

**Eleventh Amendment Immunity**

The GDC moves to dismiss the plaintiff's ADA claim for lack of subject matter jurisdiction on the basis that, as an agency of the State of Georgia, it enjoys sovereign immunity under the Eleventh Amendment from claims brought pursuant to the ADA.[1]  The court notes the complete lack of argument by the GDC in support of its assertion of immunity, which is understandable since it is without merit.

As an agency of the state, GDC enjoys the same sovereign immunity protection as the state.  But the Eleventh Amendment does not immunize a state from suit if Congress has statutorily abrogated a state's immunity or if a state has waived such immunity.  Seminole Tribe of Florida v. Florida, 517 U.S. 44, 54-56 (1996).  In support of its assertion that it enjoys Eleventh Amendment immunity from suit in the instant matter, the GDC cites to Board of Trustees of the University of Alabama v. Garrett, 531

---

[1] The GDC admits that, as a recipient of federal funds, this court has jurisdiction over the plaintiff's Rehabilitation Act claim.  Garret v. Univ. of Ala. at Birmingham Bd. of Trs., 344 F.3d 1288, 1293 (11th Cir. 2003).

U.S. 356 (2001)(holding that suits brought under Title I of the ADA are barred by the Eleventh Amendment). However, that case answers only the issue of whether Congress statutorily abrogated the states' immunity, not whether the state in that case (Alabama) had waived its immunity.

The issue of waiver is resolved differently depending on whether an action was brought in federal or state court. With respect to suits brought in federal court, at least one court in this circuit has found that the State of Georgia has in fact not waived its Eleventh Amendment immunity from federal disability discrimination claims. Gary v. Ga. Dep't of Human Res., 323 F. Supp. 2d 1368, 1372 (M.D. Ga. 2004). Nevertheless, that fact is inapposite because the claims in this case were brought in state court.

The question of whether the State of Georgia has waived Eleventh Amendment immunity from disability discrimination claims brought in state court was answered by Williamson v. Department of Human Resources, 258 Ga. App. 113 (2002). In Williamson, the court concluded that the Georgia legislature has specifically waived the state's sovereign immunity from federal disability discrimination claims because a state statute, the Fair Employment Practices Act, O.G.C.A. § 45-19-20--45-19-46, had waived immunity from comparable

9

actions brought under state law. 258 Ga. App. at 116. Accordingly, whereas a Georgia state agency may assert immunity from disability discrimination claims brought in federal court, it may not assert immunity from the same claims brought in state court. Thus, it is clear that after Williamson the State of Georgia may be sued in a Georgia state court for disability discrimination claims based on federal law. It is significant that this is exactly what Jones did in this action: she sued the GDC in state court based on Title I of the ADA.

Despite its being unable to validly assert sovereign immunity in state court after Williamson, or perhaps because of such inability, the GDC removed this case to federal court and asserted immunity from Jones' claims in this forum. However, such a litigation tactic to get around an otherwise valid waiver of immunity is foreclosed by Lapides v. Board of Regents of the University System, 535 U.S. 613 (2002).

In Lapides, the Supreme Court squarely addressed the same issue presented here: "whether a state waive[s] its Eleventh Amendment immunity by its affirmative litigation conduct when it removes a case to federal court." 535 U.S. at 617 (quotations omitted). After noting that it would be inconsistent and anomalous for a state to voluntarily invoke federal jurisdiction through

10

removal and then turn around and claim sovereign immunity from the claims brought against it, which would deny the very jurisdiction invoked through removal, 535 U.S. at 618, the Court affirmed the general rule that "where a State *voluntarily* becomes a party to a cause and submits its rights for judicial determination, it will be bound thereby and cannot escape the result of its own voluntary act by invoking the prohibitions of the Eleventh Amendment." 535 U.S. at 619(emphasis in original). The Court therefore concluded that a state's action to remove a case to federal court effectively waives its Eleventh Amendment immunity. 535 U.S. at 624. Because that is precisely the scenario presented by the GDC's actions here, its assertion of immunity from Jones' claims raised under the ADA must fail.[2] Consequently, this court has jurisdiction over all of the plaintiff's claims.

### ADA and Rehabilitation Act Discrimination

The ADA prohibits employer discrimination against qualified individuals based on that individual's disability. 42 U.S.C.A. § 12112(a). Similarly, the Rehabilitation Act proscribes employment

---

[2]The court views the GDC's argument in this regard as disingenuous at best, and it is just the sort of conduct rejected by the United States Supreme Court in Lapides and frowned upon by the Georgia Court of Appeals in Williamson, 258 Ga. App. at 114, n.1.

disability discrimination by employers who receive federal funding, and a discrimination claim brought pursuant to the Rehabilitation Act is analyzed in the same manner as an ADA claim. 29 U.S.C.A. § 794. Thus, this court's analysis of Jones' ADA claim applies equally to her Rehabilitation Act claim. Holbrook v. City of Alpharetta, 112 F.3d 1522, 1526 n.2 (11th Cir. 1997).

Discrimination under the ADA includes an employer not making reasonable accommodations for a qualified employee's known disability. § 12112(b)(5)(A). Accordingly, the ADA imposes an affirmative duty on employers to provide such reasonable accommodations unless doing so would pose an undue hardship. Morisky v. Broward County, 80 F.3d 445, 447 (11th Cir. 1996). Jones' discrimination claim rests solely on her assertion that the GDC failed to provide reasonable accommodations for her disability.

The GDC presents its argument in support of summary judgment on this claim by asserting that Jones cannot establish a prima facie case of discrimination as per the burden-shifting analysis under McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). However, this court seriously doubts the applicability of that familiar discrimination claim analysis to the very narrow issue presented by this case. The purpose of the McDonnell Douglas analysis is to determine the sufficiency of an

*intentional* discrimination claim.  See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993).  Since intent is inherently difficult to prove, McDonnell Douglas allows an inference of intent to be drawn if certain facts are proved, i.e., if a prima facie case is made.  A discrimination claim based on a failure to provide reasonable accommodations, however, is not concerned with an employer's discriminatory intent because the ADA *requires* an employer to provide reasonable accommodations.  A failure to do so is a *per se* violation of the ADA, regardless of the offending employer's intentions.  In other words, a claim that an employer failed to perform a statutory duty, such as the ADA's requirement to provide reasonable accommodations to qualified employees, does not involve a determination of whether that employer acted, or failed to act, with discriminatory intent.

The Eleventh Circuit came to the logical conclusion that the McDonnell Douglas test does not apply to reasonable accommodation claims in Nadler v. Harvey, No. 06-12692, 2007 WL 2404705, *8-*9 (Aug. 24, 2007), but it inexplicably did not publish the opinion and provide trial courts with a clear answer to this previously unaddressed issue.  Nevertheless, this court cannot ignore how decidedly inapposite the McDonnell Douglas test is in the context of determining whether an employer, as a matter of law, failed to

13

comply with a statutory duty. Because the sole issue before the court is whether the GDC failed to provide a reasonable accommodation, as it is expressly required to do under the ADA, this court will not utilize the McDonnell Douglas analysis to determine whether summary judgment is warranted.

As noted, summary judgment is warranted if Jones cannot prove an essential element of her claim. Rule 56(e). The narrow issue in this case is whether the GDC failed to provide a reasonable accommodation. Under the ADA, an employer must provide reasonable accommodation to a qualified employee with a known disability unless the accommodation would be an undue burden on the employer. § 1211(b)(5)(A). Here, the parties do not dispute that Jones is a qualified employee with a known disability, or that she was entitled under the ADA to reasonable accommodations by the GDC. Additionally, the GDC does not assert the affirmative defense that providing accommodation would be an undue burden. See Willis v. Conopco, Inc., 108 F.3d 282, 286 (11th Cir. 1997). Therefore, the sole question is whether the facts of this case can reasonably prove that the GDC failed to provide a reasonable accommodation.

A reasonable accommodation is a modification or adjustment to an employee's work environment, schedule, or duties (or other such adjustment) that enables a disabled employee to perform the

14

essential functions of the job. 42 U.S.C.A. § 12111(9); 29 C.F.R. § 1630.2(o)(1). Because the determination of an appropriate reasonable accommodation is job-specific, "it may be necessary for the covered entity to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation." 29 C.F.R. § 1630.2(o)(3). While the employer's duty in this regard is limited, it does have an obligation to engage in an informal process with the employee to identify the precise limitations posed by the employee's disability and the reasonable accommodations that could overcome those limitations. Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1286 (11th Cir. 1997); see also 29 C.F.R. § 1630.2(o)(3). Nevertheless, the employee at all times carries the burden to identify an accommodation and persuade an employer that the accommodation is reasonable. Stewart, 117 F.3d at 1286.

It is undisputed in this case that after being notified of Jones' disability and her limitation with respect to walking between the counseling offices and inmate housing units, Warden Humphrey met with Jones to discuss accommodations. In that meeting, Warden Humphrey denied Jones' request to use the medical golf cart and instead proposed modifying her work assignments in such a way that minimized the distances she would have to walk. In

response Jones rejected the Warden's proposal on the ground that even a modified caseload would still require walking greater distances than her disability permitted. Significantly, however, Jones admits that at the conclusion of their meeting Warden Humphrey asked her to think about his proposed accommodation overnight and inform him the next day whether it was acceptable. [Pl.'s Resp. to Def.'s Statement of Material Facts, ¶¶ 29-31, Doc. No. 21.] Thus, the interactive process between the GDC and Jones remained open when she opted to resign instead of returning to work the next day.

Notably, Jones merely contends that Warden Humphrey's proposed accommodation was unacceptable. She does not assert that it was Warden Humphrey who cut off their interactive process of determining a reasonable accommodation to overcome Jones' disability. Because she chose to resign instead of returning to work the day after meeting with Warden Humphrey, Jones essentially admits that the process of identifying a reasonable accommodation stopped because of what she did, not because of any action taken by the GDC. Yet Jones alleges that the GDC is liable for discriminating against her for failing to provide a reasonable accommodation.

However, the Eleventh Circuit Court of Appeals has clearly stated, "Liability simply cannot arise under the ADA when an employer does not obstruct an informal interactive process; makes reasonable efforts to communicate with the employee and provide accommodations based on the information it possesses; and the employee's actions cause a breakdown in the interactive process." Stewart, 117 F.3d at 1287. Here, there is evidence showing that the GDC has not obstructed the interactive process and has made efforts to communicate and provide reasonable accommodations based on the evidence it possessed. Meanwhile the undisputed evidence clearly shows that it was Jones, not the GDC, who caused the breakdown in the interactive process. Consequently, the GDC cannot reasonably be held liable for disability discrimination.

Jones argues that the issue of who cut-off the interactive process is moot because the GDC concedes that using a motorized scooter (instead of a golf cart) would have been a reasonable accommodation. Jones asserts that the GDC's failure to approve her request for a scooter was a failure to provide a reasonable accommodation. The GDC contends that Warden Humphrey understood Jones' request to be only for the use of a golf cart and that he did not understand Jones also to be requesting use of a scooter, which did not carry the same security risks as a golf cart and

17

would have been approved. However, this factual dispute is not material to determining whether Jones can hold the GDC liable for failing to provide a reasonable accommodation.

The material facts in this regard are whether the GDC engaged in an interactive process with Jones to determine a reasonable accommodation, whether the GDC communicated with Jones to provide reasonable accommodations based on the information it possessed, and whether the GDC's actions caused a breakdown in the interactive process. See Stewart, 117 F.3d at 1287. This court has already concluded that these facts are not disputed and that because it was Jones, and not the GDC, that caused the breakdown, Jones cannot establish an essential element of her claim.

Bearing in mind that Jones at all times carried the burden to identify an accommodation and persuade the GDC that an accommodation was reasonable, Stewart, 117 F.3d at 1286, the fact that Warden Humphrey would have approved her use of a motorized scooter is not material to the analysis here. Jones admits that the interactive process remained open when she left Warden Humphrey's office. When Jones decided that Warden Humphrey's proposed modified work schedule was unacceptable, she resigned and thereby cut-off the interactive process. In so doing, Jones abdicated her obligation to identify an accommodation and persuade

18

the GDC that it was reasonable. In view of this and the Eleventh Circuit's statement that liability for failing to provide a reasonable accommodation cannot arise when the employee causes the breakdown in the interactive process meant to identify such a reasonable accommodation, Jones' opposition to the GDC motion is unpersuasive.

Given the undisputed facts here, this court concludes that Jones cannot show that the GDC caused a breakdown in the interactive process. Consequently, Jones cannot establish an element essential to her claim that the GDC failed to provide reasonable accommodation, and, therefore, summary judgment is warranted.

### Constructive Discharge

A constructive discharge claim requires an employee to show that working conditions were so intolerable that a reasonable person in that position would be compelled to resign. Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1284 (11th Cir. 1999). Generally, a constructive discharge claim requires a "high degree of deterioration in an employee's working conditions, approaching the level of intolerable." Hill v. Winn Dixie Stores, Inc., 934 F.2d 1518, 1527 (11th Cir. 1991). Jones asserts that the GDC's

actions in this matter created intolerable working conditions and forced her to resign.

This court does not agree. When Jones resigned, she was still involved in the orientation process and had not yet begun her actual employment duties. She also was involved in an admittedly open interactive process with the GDC to determine a reasonable accommodation for her disability, and she admits that Warden Humphrey repeatedly asked her to stay at Ware prison and to give his proposed accommodation a try. These undisputed facts are insufficient to support a reasonable finding of constructive discharge and, therefore, summary judgment on this claim is warranted as well.

**CONCLUSION**

For the foregoing reasons, the GDC's Motion for Summary Judgment [Doc. No. 14] is GRANTED.

SO ORDERED, this 18th day of March, 2008.

/s/ Robert L. Vining, Jr.
ROBERT L. VINING, JR.
Senior United States District Judge